ELDORA MIZNER, Appellee, v. F. W. LOHR et al., Executors, Appellants.

No. 40855.

OCTOBER 27, 1931.

REHEARING DENIED FEBRUARY 10, 1932.

D. F. Loepp and F. W. Lohr, for appellants.

Strong & Seff, for appellee.

MORLING, J.—Plaintiff, a school girl 14 years old, was riding as a guest in the car being driven by Eacret northwardly on Cleveland Street, a dirt road terminating at Stone Avenue, an east and west paved street. The original defendant, William Schneider, was the owner of a car which was being driven with his consent by his son eastwardly on Stone Avenue toward the Cleveland Street junction. Defendant having since died, the

executors of his estate have been substituted as appellants. The collision in question occurred between these cars at the junction of Stone Avenue and Cleveland Street.

I. Defendants contend that the collision was caused by the negligence of Eacret and not by that of defendant's son. Plaintiff's evidence tends to show that Eacret noticed defendant's car coming from the west on Stone Avenue at a speed of 50 miles an hour and "weaving" from one side of the road to the other; that the car in which plaintiff was riding was thereupon stopped four or five feet south of the south line of the Stone Avenue paving and sufficiently to the right side of Cleveland Street for defendant's car, if it turned into that street, to pass; that while the car was thus standing still defendant's car collided with it. The case was for the jury.

II. Defendants urge that the court in instructions in the statement of the issues to the jury "copied almost verbatim from the pleadings in the case." There was no prejudicial copying of the plaintiff's allegations, nor were the instructions excepted to on that ground.

III. Defendants assign error in that plaintiff asked defendant's son on cross-examination whether the son drove the father (defendant) around to various farms and whether the father was able to go around and visit his various farms. The son had testified on direct examination that his father was sick and for that reason had not been driving the car much and was not appearing in court; that the father permitted the son to drive the car and the son was driving with his consent on the evening of the accident. Plaintiff's cross-examination of the defendant's son contained the following: "Q. Do you drive him around to various farms? A. Yes, sir. Q. He is able to go around and visit his various farms?" Defendant's counsel objected "to counsel going into that for prejudicial purposes." The objection and motion "to strike it for that reason" were sustained. Plaintiff, not defendant, excepted. Error does not appear.

IV. Defendant further assigns error in permitting plaintiff's counsel in his argument to the jury to call plaintiff "to be seated immediately beside the jury to view and inspect the scar and wound on her face." Plaintiff had been a witness and without objection was asked to turn her face evidently to

the jury. She was examined and cross-examined minutely with reference to the injury to her face, the surgical operations performed upon it and to the feeling in it. She was asked without objection, "Will you turn your face around and show the jury where they put the drain?" She answered, "they connected it right in here and the drain ran down to the inside of my mouth and they took stitches in there to hold it in." She testified on cross-examination: "Q. The deeper part of the scar is up towards the top, isn't it? A. Yes, sir. Q. Right where I have my pencil? A. Yes, that is about the deepest place. Q. Where did this saliva come out, where was that? A. Right here, at these points." The court in response to defendant's objection during the argument of plaintiff's counsel gave the situation in the court room as follows:

"There are four rows of seats, and the closest jurors in the front row are probably eight feet from the witness when she was in the box, the second row are probably twelve feet, the third row probably sixteen feet, and the fourth row twenty feet from the witness, and the witness has not been examined closely by the jury, but her scar was exhibited to the jury when she was in the witness box, and I think it is proper at this time if the jury want to see the nature of this injury; they will have to pass on the amount of damages, if any."

No error appears in this connection.

V. Defendant complains that the verdict is excessive. The amount allowed by the jury was $5950. Plaintiff at the time of the trial was a junior high school girl, 14 years old, with an expectancy of 37.2 years. The trial was about six months after the accident. Plaintiff testified as above set forth and that she suffered some pain in the face about six weeks; that she was having headaches so she couldn't see and had quit school; that she was having a little trouble with her left eye. "Q. Is the feeling the same on the left side of your face as on the right side of your face? A. No, sir. * * * I cannot feel anything; I just feel it is there, is all."

The attending physician testified that:

"There was a very severe extensive laceration on * * * the left side of the face, extending from about the level of the upper portion of the ear down under the jaw, and quite a deep cut, so

that the flesh laid well open. Also there was some minor cuts up around the temple, and the left knee was badly sprained and some abrasions I think on the third finger of the right hand. * * * I probably took three or four deep stitches in her face and superficial, probably nine or ten. * * * I think she went home from the hospital the next afternoon. She was not able to walk for some time. I think her left knee was wrenched. I attended her then for about 10 days. Later on I took her back to the hospital. The cause of her trouble at that time was that at the time of her injury the Stensen duct leading from the parotid gland and into the mouth, carrying the secretion from the parotid gland, was cut, and it became necessary later to repair this. * * * The sprain she received was very painful. There was a decided swelling of the knee about the whole knee joint. * * * This girl is still under my care. * * * The scar on her face will be permanent. * * * I think there will be some paral-ysis remaining. I doubt if you could remove the scar by any subsequent procedure. At the time of the second operation we had to open the wound completely. * * * The duct that was involved leads from just about the level of the lower part of the ear, forward probably two or two and a half inches. * * * In this scar the skin and the subcutaneous tissue is cut through and I think there will be a permanent scar. Such a scar has a tendency to repair but there is also a tendency for wounds, where the subcutaneous tissue is drawn on, as it would be in a facial or muscular tissue, to rather deepen. * * * I feel that a knee that has been badly wrenched is subject to such that we get rheumatism, or a tubercular condition; there is more possible chance of its settling in that joint than it would be if that had not occurred. * * * The movements of the face are, * * * not wholly normal, they are better than they were. * * * I would say there was an appreciable abnormality there.''

The surgeon performing the second operation says:

''A lot of gelatinous tissue, I would say a quarter of an inch thick, had to be dissected out, the whole tract had to be reopened, and be dissected out carefully, before we could get any form of union. * * * This operation took probably about two and one-half hours. She was under ether during that time. * * * When the swelling disappeared after the operation some facial

paralysis became apparent which is due to the severing of the nerve end. * * * The facial paralysis is as marked to me as it was. * * * In my opinion, that condition is permanent in this case. * * * There is a possibility of scar tissue forming where this canal duct was connected. There might be a possible stenosis or the forming of scar tissue which would necessitate a re-operation. Such a thing is possible but not likely. Q. Now if this parotid—if this gland were removed, the parotids were removed, would that have any effect on the girl's health? A. It would certainly impair the girl's health to a degree. * * * Q. Will that scar always remain there? * * * A. It will always remain there, of course. * * * If there should be a recurrence of scar tissue and again an obstruction then, of course, you could do this same operation again, and then perhaps nothing would do eventually if you could not establish the potency there, or get rid of the saliva, you would have to remove the gland. I would say that there was a remote, yes, absolutely remote possibility. * * * Q. Now, Doctor, you did not anticipate any facial paralysis did you, until later? A. I certainly did. * * * Q. Isn't it true as time goes on, the scar gets a little paler? A. I wouldn't say to that, it might get a good deal worse. * * * In a case of this sort, and the injury she received you sometimes have a keloid formation, you might get a scar, might have to be removed. It might become more pronounced. It is not likely to, though.''

The amount of the verdict or the record otherwise is not such as to show passion or prejudice. It cannot be held as matter of law that the verdict is excessive.

Much of the argument in behalf of appellant is upon matters not within any exception taken in the lower court. We find no error.—Affirmed.

FAVILLE, C. J., and EVANS, KINDIG, and GRIMM, JJ., concur.